Duane Carreiro

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

PROSPECT WATERPROOFING ) CASE NO. 1:06-CV00693
COMPANY ) HON. RICHARD J. LEON
    Plaintiff )
vs. ) ORIGINAL
CLARK CONCRETE )
CONTRACTORS, LLC )
    Defendant )

Deposition of Duane Carreiro

Washington, D.C.

November 14, 2006

Reported by: Bonnie L. Russo

JOB NO. 637344

EXHIBIT 1

Esquire Deposition Services     MD - 1-800-539-6398
D.C. - 1-800-441-3376     VA - 1-800-752-8979

Duane Carreiro

Page 5

1          P R O C E E D I N G S

2 DUANE CARREIRO,

3 was called for examination by counsel and,

4 after having been duly sworn by the Notary, was

5 examined and testified as follows:

6       EXAMINATION BY COUNSEL FOR PLAINTIFF

7       BY MR. ALLEN:

8    Q.   Mr. Carreiro, would you state your
9 full name for the record.

10   A.   It's Duane John Carreiro.

11   Q.   And your home address, sir?

12   A.   It's 205 North Wayne Street,
13 Apartment 6, Arlington, Virginia.

14   Q.   22201?

15   A.   Yes.

16   Q.   Great.

17        I'm Chuck Allen.  I represent -- I'm
18 with the law firm Goodman, Allen, and Filetti
19 in Richmond, Virginia.

20   A.   Uh-huh.

21   Q.   And I represent Prospect

Page 6

1  Waterproofing Company along with Virginia
2  DeLuca, who's on the phone from Clausen &
3  Miller in New York.
4           MS. DELUCA:  Hi, Duane.
5           THE WITNESS:  Hi.
6           BY MR. ALLEN:
7      Q.   We're here to ask you some questions
8  about the accident that occurred on April 21st.
9  And our only purpose is to get your truthful
10 recollection about what occurred on that date.
11     A.   Okay.
12     Q.   So in order to do that I have to ask
13 some questions and hopefully you will answer
14 them and we'll have a dialogue that will be
15 taken down by the court reporter.
16     A.   Okay.
17     Q.   Have you ever had your deposition
18 taken before?
19     A.   No.
20     Q.   Okay.  There are some very simple
21 sort of ground rules.  One is that if you need

Duane Carreiro

Page 11

1 management with submittals and drawings and all
2 those types of things.
3    Q.    And where did you go after Barr &
4 Barr?
5    A.    Actually went back to -- it's a long
6 story. I got divorced. I left and went back
7 to that first company.
8    Q.    Okay.
9    A.    It was McClain Trucking. McClain
10 Trucking Company. And I was there for six
11 months while I was deciding what I was going to
12 do during my divorce and then I moved down here
13 in June of 2003, I believe. Three and almost
14 four -- this June will be four years I have
15 been here.
16    Q.    Okay. Right.
17          So in June of 2003 you moved here
18 and did you immediately get employed by Clark?
19    A.    Within a few weeks of being here.
20    Q.    And are you employed by Clark
21 Construction?

Duane Carreiro

Page 12

1  A.  Yes.

2  Q.  And you know there are some other
3 Clark entities that are affiliated with Clark
4 Construction; is that correct?

5  A.  Sure.

6  Q.  What are the ones that you're
7 familiar with?

8  A.  There is Clark Foundations, Clark
9 Concrete, there is Shirley Contracting. Those
10 are the big ones.

11  Q.  They're basically run by the same
12 organization?

13  A.  Yes. I think they fall under --
14 yeah.

15  Q.  And do they -- to the best of your
16 knowledge, do they follow the same safety
17 procedures and manuals and the like?

18  A.  Yes. Similar. I mean, I don't
19 know -- I don't go -- you know, I've never been
20 to a Clark Concrete safety meeting so I can't
21 say for sure.

Duane Carreiro

Page 17

1   A.   I would assist the party chief who
2 is the guy that does calculations for layout of
3 radiuses and elevations and whatnot, to
4 actually tell you where the building needs go
5 in relation to like property corners and things
6 like that so you're building the right spot and
7 building it the way that the architect and
8 engineers have designed it.
9   Q.   **And did you have any safety**
10 **responsibilities?**
11   A.   Right off the bat I would say my
12 responsibilities were just the field
13 engineering.
14   Q.   **When you were at BWI parking garage**
15 **project or the Calvary Baptist Church project**
16 **or the 2400 M. Street project, were any of**
17 **those projects under the supervision of the**
18 **superintendent John Neuenschwander?**
19   A.   No.
20   Q.   **So the first time that you worked**
21 **under his supervision was at the Quincy Park**

Page 18

1 Condominium project?

2   A.   Correct.

3   Q.   Was he your direct supervisor on
4 that project?

5   A.   Quincy Park?

6   Q.   Yes.

7   A.   Yes.

8   Q.   What were your responsibilities,
9 day-to-day responsibilities at Quincy Park?

10   A.   When I first started I was the field
11 engineer with the party chief. I did the --
12 what we call -- you have a rod man or an
13 instrument man who is out there physically
14 either using an instrument to turn angles and
15 say, okay, you know, over the radio you come a
16 foot, do whatever to get to a certain point to
17 do layout.

18   Q.   To do the survey layout?

19   A.   That was my primary responsibility.

20   Q.   And once the survey layout was
21 completed what responsibilities did you have?

Page 19

1   A.   Well, that type of -- the layout
2 continued up through the building while
3 concrete is going up.  Because once concrete
4 finishes a floor then we would come in and do
5 control lines for other trades to lay out the
6 drywall partitions and whatnot.  So that
7 continued up through the building while
8 concrete was progressing.
9   **Q.   So you were continuing to doing that**
10 **responsibility even through April 21st, 2004**
11 **when the accident occurred?**
12   A.   Yes.  I had -- at that point, I had
13 other responsibilities.
14   **Q.   What other responsibilities did you**
15 **have at that point?**
16   A.   I was taking care of a lot of the
17 exterior skin work that was going on, checking
18 the mason's progress, checking their work to
19 make sure they were doing their work correctly.
20 And I was just slow -- gradually having more
21 responsibility, you know, checking, you know,

1  as I kind of became the assistant
2  superintendent there.
3      Q.    Sure.
4      A.    I had more responsibility to make
5  sure, you know, if I see something that's
6  wrong, instead of just being one of the guys
7  that walks by it, I -- you know, we had a
8  responsibility to correct those -- correct
9  those problems.
10     Q.    Did -- as time went on and up until
11 April 21st, 2004, did you begin assuming more
12 and more responsibility with regard to
13 assigning tasks with the subcontractors to do
14 from time to time?
15     A.    Somewhat.
16     Q.    Did you take on that role with
17 regard to Prospect?
18     A.    Yeah. I would say somewhat. My --
19 you know, I would, you know, say, hey, we need
20 to do this or that. And if there was a problem
21 or if there was any confusion, you know, I

Duane Carreiro

Page 38

1 this was at the beginning.  Their frequency
2 probably may have decreased as the building was
3 closed in and, you know, more of the hazards
4 were going away.  I don't remember the
5 specifics.
6     Q.    Did -- approximately how long prior
7 to April 21st, 2004 was the penthouse deck
8 first poured?
9     A.    Say that again, please.
10    Q.    Yeah.
11          Approximately how long prior to
12 April 21st, 2004 was the penthouse deck poured?
13    A.    I think it was a matter of days.  I
14 don't remember the specific time frame, but it
15 was -- I would say within a week or less.
16    Q.    And do you know approximately how
17 long before April 21st , 2004 the forms were
18 stripped from that deck?
19    A.    Also a matter of days.  I don't know
20 specifically.
21    Q.    And was it Clark Concrete

1 investigation as to whether or not the plywood
2 covering the roof hatch had been fastened to
3 the roof hatch prior to the accident after the
4 accident occurred?
5     A.    No.
6     Q.    Okay.  You were never asked to do
7 that kind of investigation; is that correct?
8     A.    That's correct.
9     Q.    Okay.  Do you know if anyone was?
10    A.    I don't know.
11    Q.    Do you have any information
12 concerning whether or not the roof hatch was,
13 in fact, fastened or the plywood, rather, was
14 fastened to the roof hatch hole prior to the
15 accident?
16    A.    I don't know.  I don't have that
17 information.
18    Q.    You didn't see anything on the
19 morning of April 21st, 2004 that would indicate
20 it was fastened to the roof hatch hole,
21 correct, sir?

Duane Carreiro

Page 69

```
 1    A.    Yeah.

 2    Q.    I'm sorry?

 3    A.    Yes.

 4    Q.    You did see some?

 5    A.    No, I don't have any recollection of
 6  that.

 7    Q.    And you didn't make any observation
 8  that would indicate it was fastened to the roof
 9  hatch hole; is that correct?

10    A.    I can't remember making that
11  observation.

12    Q.    And you didn't make any indication
13  in your statement that the plywood had been
14  fastened to the roof hatch hole, correct, sir?

15    A.    At that time, no.  I don't recall.

16    Q.    That's fine.  Thank you.

17          Other than providing this statement,
18  did you participate in any other way in an
19  investigation of the accident involving Mr.
20  Coc?

21    A.    No.  Only from speaking with -- you
```